AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Mobile telephone assigned telephone number
614-373-0343

Case No. 2:22-mj-793

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 (incorporated by reference)

located in the  Southern  District of  Ohio , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 26 USC 7201, 7206(1), 7206(2), and Title 18 USC 287 | Tax Evasion, Filing a False Return, Assisting in Preparion of a False Return, False Claims |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Evan Llewellyn, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12-15-22

*Judge's signature*

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

City and state: Columbus, Ohio

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**AFFIDAVIT**
IN SUPPORT OF SEARCH WARRANT

I, Evan Llewellyn, Special Agent, U.S. Department of the Treasury, Internal Revenue Service, Criminal Investigation, being first duly sworn, herby depose and state as follows:

**Introduction and Purpose**

1. I am a Special Agent with the Internal Revenue Service - Criminal Investigation (IRS-CI) and have been so employed since 2010. I am currently assigned to the Columbus Post of Duty in the Cincinnati Field Office. I have received specialized law enforcement training at the Federal Law Enforcement Training Center, Glynco, Georgia and additional specialized training from the IRS. My primary duties as an IRS-CI Special Agent include conducting criminal financial investigations of potential violations of Title 26 (Internal Revenue Code), Title 18 (money laundering and related specified unlawful activities), and Title 31 (Bank Secrecy Act) of the United States Code. I earned my Bachelor's degree in Business Administration from Miami University in Oxford, Ohio. I earned my Master of Business Administration and Juris Doctorate from The University of Akron in Akron, Ohio. As an IRS-CI Special Agent, I have personally conducted and participated in numerous criminal financial investigations.

2. I make this affidavit in support of an application for a search warrant authorizing the search of the person DURRELL GIVENS-CALDWELL (GIVENS) as further described in Attachment A-1, for the items described in Attachment B.

3. The property to be searched is one mobile telephone assigned number 614-373-0343 ("TARGET DEVICE") as further described in Attachment A-2. As explained below, there is reason to believe that GIVENS owns and uses the TARGET DEVICE.

4. The applied-for warrant would authorize the forensic examination of the TARGET DEVICE for the purpose of identifying the electronically stored information particularly described in Attachment B.

5. Based on the facts set forth below, I submit that there is probable cause to believe that the TARGET DEVICE is presently located in the Southern District of Ohio and contains evidence and instrumentalities of violations of 26 U.S.C § 7206(2) (assisting in the preparation of false tax returns), 18 U.S.C. § 287 (false claims), 26 U.S.C. § 7206(1) (filing a false return), and 26 U.S.C. § 7201 (tax evasion) hereinafter referred to collectively as the "Target Offenses."

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Evidence of Probable Cause

### Overview of Alleged Tax Return Preparation Scheme

7. It is the responsibility of the IRS's Scheme Detection Center (SDC) to identify alleged fraudulent federal income tax return schemes. The SDC discovered a potential fraud scheme involving the return preparer, GIVENS, through his business, FORTUNE ELITE BUSINESS SOLUTIONS (FORTUNE). Although FORTUNE has several listed preparers, GIVENS is named on the majority of those filed. As of August 23, 2022, FORTUNE's electronic filing summary for client returns was as follows:

| Processing Year | Total Returns | Refunds Claimed | Refunds Issued | Refunds Held | # Sch C Returns | # Sick & Family Leave Returns |
|---|---|---|---|---|---|---|
| 2022 | 303 | $3,482,364 | $2,651,068 | $853,437 | 280 | 220 |
| 2021 | 171 | $711,003 | $724,996 | $29,145 | 140 | 36 |
| 2020 | 120 | $325,184 | $326,427 | $9,525 | 94 | 0 |
| 2019 | 88 | $246,514 | $232,235 | $20,621 | 73 | 0 |

Note: The dollar amounts of refunds issued by the government may not be the same as refunds claimed due to questionable refunds held, refunds cancelled and reissued, audits, adjustments, penalties, and interest.

8. The primary concern is for processing year 2022 in which a total of $3,482,364 in refunds were claimed. The requested refund rate of 98% was unusually high, compared to a national average of only 67%. Moreover, 73% of filed returns requested sick and family leave credits claimed on Forms 7202, Credits for Sick Leave and Family Leave for Certain Self-Employed Individuals (Forms 7202). Whereas the national average of requested Form 7202 credits is only 0.9%.

9. Your affiant knows a false Forms 7202 can be used to create a refund. These credits are based on an individual's average daily self-employment income and the number of days during the taxable years that the individual was unable to perform services as a self-employed individual due to certain reasons related to COVID-19.

10. The Form 7202 applies to tax years 2020 and 2021. Congress first authorized the Form 7202 credits for applicable dates of April 1, 2020, through December 31, 2020, in the Families First Coronavirus Response Act (FFCRA), enacted March 18, 2020. Congress extended the applicable dates to April 1, 2020, through March 31, 2021, in the Covid-Related Tax Relief Act, enacted December 27, 2020, and further again to April 1, 2021 through September 30, 2021, in the American Rescue Plan Act (ARPA), enacted December 27, 2020.

11. A Form 7202 is filed with a Form 1040, U.S. Individual Income Tax Return (Form 1040) and necessitates reporting of self-employment income on a Schedule C, Profit or Loss

From Business (Schedule C). The Schedule C largely originates the individual's average daily self-employment income from which to determine the amount of credit.

12. Processing years 2019, 2020, and 2021, are equally concerning. During those years, a combined total of $1,282,701 in refunds were claimed. Again, the refund rates of 86%, 88%, and 92% respectively, were unusually high. Moreover, the rate of returns with Schedules C were 83%, 78%, and 82% respectively. Whereas the national average of returns with Schedules C is only 20%.

13. You affiant knows a false Schedule C can be used in multiple ways to create a refund. First, a false Schedule C claiming a business loss can be used to reduce taxable income for an otherwise typical wage earner and recoup federal income tax withheld by their employer. Of the Schedules C filed, business losses were claimed in 73%, 77%, and 73% respectively. Second, a false Schedule C claiming profit for an otherwise non-employed individual can qualify the individual for the Earned Income Credit (EIC). The EIC is available to low to moderate income workers and can be increased with the presence of qualifying dependent children. Claiming dependent children may also qualify taxpayers for the Additional Child Tax Credit (ACTC).

## Overview of GIVENS and FORTUNE

14. As of November 18, 2016, GIVENS was registered with the IRS as a paid tax preparer with FORTUNE. A search of the Ohio Secretary of State's website reveals GIVENS is an owner of FORTUNE. FORTUNE has a strong social media presence on Facebook as "Fortune Elite Business Solutions," Instagram as "fortuneelitetaxes," and Twitter as "The Tax Doctor, @FortuneEliteTax." FORTUNE's website is www.fortuneeliteoh.com. The sites represent GIVENS as the owner, college graduate, and recipient of a Master's in Business Administration. Each site advertises the phone number 614-373-0343.

15. FORTUNE's website shows a video in which GIVENS personally advertises "Fortune Filing" in which "no longer a need to file in person." The process is 1) "Take a picture of your filing documents," 2) "Text docs to 614-373-0343 or [email] docs to EliteSolutionsOH@gmail.com," and 3) "Receive a phone call within 1hr or less with your filing results."

16. FORTUNE does not have a storefront. Instead, FORTUNE advertises its office location as 4200 Regent Street, Suite 200, Columbus, Ohio 43219, which is a coworking space operated by Office Evolution.

## GIVENS's personal tax returns

17. IRS records show Forms 1040 filed in the name of GIVENS for tax years 2017 through 2021. The Forms 1040 each list the filing status as single and/or head of household and report a Schedule C for FORTUNE as the sole source of income. The returns match a pattern of manipulating Schedules C and Forms 7202 for refunds.

18. GIVENS's 2017 Form 1040 reported minimal income of $18,435 to qualify GIVENS for an EIC of $5,616. In addition, GIVENS claimed two dependent nephews to qualify for an ACTC of $2,000. Only one nephew shared a version of GIVENS's hyphenated last name. The nephews listed years of birth were 2016 and 2017. A search of IRS records revealed GIVENS did not claim the nephews on any previous or subsequent tax returns. The requested refund was $4,664.

19. GIVENS's 2018 Form 1040 reported minimal income of $18,566 to qualify GIVENS for an EIC of $3,461. In addition, GIVENS claimed one dependent daughter to qualify for an ACTC of $1,400. The daughter did not share GIVENS's last name. The daughter's listed year of birth was 2018. A search of IRS records revealed GIVENS did not claim the daughter on any previous or subsequent tax returns. The requested refund was $2,238.

20. In August 2020, GIVENS deviated from his previous pattern of reporting minimal income to qualify for the EIC. IRS records show GIVENS filed an Amended 2018 Form 1040 and a 2019 Form 1040 – both of which reflect higher income of $60,269 and $74,611 respectively, and a tax owed. Both returns were dated as signed on August 12, 2020. It is believed GIVENS deviated from his normal filing pattern of minimal income to provide proof of income via tax returns to a lender to secure financing on a new residence. An online search of the Franklin County Recorder's office revealed, in September 2020, around a month after filing the returns, GIVENS received a mortgage for $204,250 and purchased real property in Canal Winchester, Ohio.

21. GIVENS's 2020 Form 1040 reports high self-employment income of $63,872 and claimed 140 days of sick and family leave due to coronavirus-related care to qualify for the Form 7202 credit of $14,770. GIVENS did not claim any dependents. The requested refund was $2,033.

22. GIVENS's 2021 Form 1040 reports high self-employment income of $96,443 and claimed 280 days of sick and family leave due to coronavirus-related care to qualify for the Form 7202 credit of $32,220. In addition, GIVENS claimed two new dependent daughters which qualified him for a $6,000 Credit for Qualifying Children and Other Dependents. The daughters did not share GIVENS's last name. A search of IRS records revealed GIVENS did not claim the daughters on any previous or subsequent tax returns. The requested refund was $20,628.

**Taxpayer/Client Complaint**

23. In June 2022, a former client of GIVENS/FORUTNE filed a Form 141457-A, Tax Return Preparer Fraud or Misconduct Affidavit. Subsequently, Special Agents with IRS-CI interviewed the client.

24. The client saw a FORTUNE advertisement on Facebook and called the listed phone number, 614-373-0343. The client briefly spoke to GIVENS. GIVENS requested texted pictures of the client's tax documents. The client texted pictures of their driver's license

and Form W-2, Wage and Tax Statement (Form W-2) to 614-373-0343. Also, the client provided a bank account routing and account number. GIVENS did not ask any typical return preparer questions. GIVENS texted back the client would get a refund of $1,726. The fee would be taken from the refund. The client agreed. There was no face-to-face meeting. The client did not sign any papers and/or receive a copy of the prepared return.

25. IRS records show, in April 2022, the IRS received an electronically filed 2021 Form 1040 in the name of the client with GIVENS as the listed preparer and FORTUNE as the listed preparation firm. Special Agents showed the filed Form 1040 to the client. The associated Form W-2 was correct. However, the associated Schedule C and Form 7202 were false. The client was not self-employed and therefore did not have any net self-employment earnings. Accordingly, he did not qualify as a self-employed individual who was unable to work due to coronavirus-related care. The associated false credit on the Form 7202 was $20,290. The refund requested was $11,601.

26. Moreover, the client never received a refund. GIVENS did not return the client's calls/texts inquiring about the refund. The client called the IRS and discovered the full refund amount was $11,601 and the refund was processed through SBTP Group as refund transfer. A refund transfer involves the creation of a temporary account at a financial services company which receives a taxpayer's federal tax refund. Fees are then paid from the temporary account. The remaining amount is then disbursed to the taxpayer in the form of direct deposit, cashier's check, or prepaid card. SBTP Group, through their online taxpayer portal, informed the client the expected refund was $11,601 but SBTP Group only received $7,961.79. IRS transcripts show the difference of $3,639.21 went towards the client's back-taxes. Bank fees were $39.95. Transmitter fees were $99.00. FORTUNE's tax preparation and filing fees were listed as $7,997.76 but only $7,822.84 was available to pay. FORTUNE received the remaining $7,822.84. The exorbitant tax preparation and filing fees were not disclosed to the client. There was no money left over to be disbursed to the client. As such, the client did not receive any refund.

## Undercover Operation

27. In October 2022, an Undercover Agent (UCA) with IRS-CI, in an undercover capacity and using a cover identity, contacted an individual who reported to be GIVENS with FORTUNE. All contact was by phone call and text message to phone number 614-373-0343. All phone conversations and text messages were recorded. There was no face-to-face meeting. The purpose of the contact was to have a 2021 federal income tax return prepared and filed.

28. During the first phone conversation, GIVENS requested the UCA text GIVENS a picture of his "ID an W2s." The UCA informed GIVENS he needed a personal return and had only one Form W-2. GIVENS stated the preparation fee starts at $299 but "depends on if you want kinda the maximum return back or just wanna file and get it over with." The UCA requested the "maximum." GIVENS did not ask any additional questions. After the phone call, the UCA texted a picture of his cover identification document and a cover Form W-2 showing wages of $24,992 and federal income tax withheld of $1,295.

29. Later, GIVENS texted and subsequently called the UCA. GIVENS asked if the UCA received the "third stimulus payment." The UCA replied it was received. GIVENS explained "the return when I put in your information kinda without me like doing anything extra is whatever like 3 bucks." GIVENS asked if the UCA did "anything on the side like any personal business or side hustles." The UCA explained he did not. The UCA just had a "regular job." GIVENS offered "to work some magic" and "try a couple other things to get you some kind of refund." The UCA expressed he did not know how that worked but asked for GIVENS to do "whatever." GIVENS explained the refund will arrive in about a month from a check printed out from the bank which can be picked up from GIVENS's office at 4200 Regent Street. GIVENS ended with "I can make something work for you" and said, "I'll shoot you a text this evening." This was the last verbal conversation.

30. The next day, GIVENS texted, "I was able to get you a refund of $3200 is that cool?" The UCA texted back, "Yeah that's fine thanks."

31. Shortly thereafter, the IRS received an electronically filed 2021 Form 1040 in the cover name of the UCA with GIVENS as the listed preparer and FORTUNE as the listed preparation firm. The associated Form W-2 matches the cover Form W-2 the UCA provided GIVENS. The UCA's occupation was listed as "Entrepreneur." A Schedule C was included. The Schedule C listed a business name of "MBS Cleaning Service" and reported a profit of $39,825. The Schedule C is false as the UCA informed GIVENS the UCA was not self-employed. A Form 7202 was included. The Form 7202 listed the UCA took sick and family leave due to coronavirus-related care making the UCA unable to perform services as a self-employed individual for a total of 280 days. The result was a credit of $28,060. The Form 7202 is false as the UCA informed GIVENS the UCA was not self-employed. Moreover, GIVENS never asked the UCA and the UCA never provided GIVENS any information regarding COVID-19 and/or coronavirus-related care. The refund requested was $18,723. The refund was stopped by the IRS.

32. The UCA accessed SBTP Group's online taxpayer portal. The expected refund was $18,723. but SBTP Group only received $7,961.79. Expected bank fees were $54.90. Bank fees were $39.95. Expected transmitter fees were $99.00. FORTUNE's tax preparation and filing fees were listed as $14,004.12. The exorbitant tax preparation and filing fees were not disclosed to the UCA. If the refund was paid as expected, the remaining amount to the UCA would have been $4,564.98.

## Mobile Telephone

33. Based on my training and experience, a mobile telephone (or wireless telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.

In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

34. Based on the facts above, I know that the TARGET DEVICE is a mobile telephone which at least has the capabilities of communicating with other telephones; sending, receiving, and storing text messages; and sending, receiving, and storing still photographs.

**Electronic Storage and Forensic Analysis**

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of their use, who used them, and when. There is also probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICE because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from the word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is the evidence described by the warrant.

## Biometric Authentication

38. The warrant I am applying for would permit law enforcement to obtain from GIVENS the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the TARGET DEVICE subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

    a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

    c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The

      device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

   d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

   e. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

   f. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

39. Based on the aforementioned facts and my training and experience, it is likely that GIVENS is the user of the TARGET DEVICE and that his fingerprints and/or facial features are among those that are able to unlock the TARGET DEVICE.

## Conclusion

40. Your affiant believes, based on his training and experience in conducting financial investigation and the facts set forth herein, the following:

41. That GIVENS is preparing and electronically filing false refund returns on behalf of himself and others with the Internal Revenue Service, in violation of 26 U.S.C § 7206(2) and 18 U.S.C. § 287;

42. That GIVENS has willfully subscribed false returns on his own behalf in violation of 26 U.S.C § 7206(1) and committed tax evasion in violation of 26 U.S.C § 7201.

43. I further believe that GIVENS used the TARGET DEVICE to communicate and facilitate the fraudulent federal income tax return scheme, and evidence of the above violations is now located in the TARGET DEVICE described in Attachment A-2.

Evan W. Llewellyn
Special Agent, IRS-CI

Subscribed and sworn to before me

This   15   day of   December  ,  2022.

THE HONORABLE CHELSEY M. VASCURA
United States Magistrate Judge

## ATTACHMENT A-1

### Person to be searched

The person to be searched is DURRELL GIVENS-CALDWELL, a 33-year-old, male, born 06/23/1989 standing approximately six feet 3 inches and weighing approximately 235 pounds.



## ATTACHMENT A-2

### TARGET DEVICE to be searched

The TARGET DEVICE to be searched is one mobile telephone assigned telephone number 614-373-0343 belonging to DURRELL GIVENS-CALDWELL.

## ATTACHMENT B

## ITEMS TO BE SEIZED

1. The TARGET DEVICE, for the limited purpose of downloading, imaging or otherwise searching for and seizing the items described herein.

2. All records and information on the TARGET DEVICE that are fruits, instrumentalities, and evidence of violations of 26 U.S.C § 7206(2) (assisting in the preparation of false tax returns), 18 U.S.C. § 287 (false claims), 26 U.S.C. § 7206(1) (filing a false return), and 26 U.S.C. § 7201 (tax evasion); occurring from in or around January 1, 2019 through the present, specifically:

    a. Communications and attachments related to tax return preparation, including any emails, text messages, voice messages, and other electronic communications;

    b. Electronically recorded documents relating to tax return preparation, tax documents, bank and other financial records, checks, notes, ledgers;

    c. Data and documents relating to financial transactions involving DURRELL GIVENS-CALDWELL (GIVENS), including journals or ledgers, requests for payment, invoices, claims or any other billing documents, bank checks, payroll payments and records, bank statements, bank drafts, credit cards, records of wire transfers, green dot cards, money orders, prepaid debit cards, cryptocurrency, or other financial instruments or records reflecting payments received or sent;

    d. Communications, data, and documents relating to FORTUNE ELITE BUSINESS SOLUTIONS (FORTUNE);

    e. Communications, data, and documents with or relating to any identified or unidentified co-conspirator;

    f. Web browsing or internet search history relating to tax preparation and fraud;

    g. Call logs and lists of incoming and outgoing phone calls between GIVENS and any identified or unidentified co-conspirator;

    h. Names, phone numbers, and e-mail addresses stored within the phone directory for any identified or unidentified co-conspirator;

    i. Evidence of user attribution showing who used or owned the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    j. Evidence relating to GIVENS's state of mind as to the crimes under investigation.

3. The records and information requested herein shall include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. During the execution of the search of the TARGET DEVICE described in Attachment A-2, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of GIVENS to the fingerprint scanner of the TARGET DEVICE; (2) hold the TARGET DEVICE in front of the face of GIVENS to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

5. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.